DOUGLAS H. WIGDOR (NY SBN 2609469)
JEANNE M. CHRISTENSEN (NY SBN 2622124)
ELIZABETH J. CHEN (NY SBN 5126214)
(All admitted *pro hac vice*)
**WIGDOR LLP**
85 Fifth Avenue
New York, NY 10003
Tel.: (212) 257-6800
Fax: (212) 257-6845

JAMIE C. COUCHE (SBN 252001)
**ANDERSON & POOLE, P.C.**
601 California Street, Suite 1300
San Francisco, CA 94108
Telephone: (415) 956-6413
Facsimile: (415) 956-6416

Attorneys for Plaintiffs,
**RUIQI YE, YOLIN HAN**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUIQI YE and YOLIN HAN, individually and on behalf of all other similarly-situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> SEPHORA USA, INC., <br><br> Defendant. | Case No. 3:14-cv-05237-EMC <br><br> **JOINT SUPPLEMENTAL BRIEF TO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** <br><br> **CLASS ACTION** <br><br> Date:    January 19, 2017 <br> Time:    1:30 p.m. <br> Ctrm:    5, 17th Floor <br> Judge:   Hon. Edward M. Chen |

## **TABLE OF CONTENTS**

A.    Size of the Class ............................................................................................. 1

      Plaintffs' Statement ........................................................................................ 1

      Sephora's Statement ....................................................................................... 3

B.    Release ............................................................................................................. 3

C.    Maximum Value of the Case: Economic and Compensatory Damages ........... 4

      Plaintiffs' Statement ....................................................................................... 4

      1.    Economic Harm .................................................................................. 4

      2.    Compensatory Harm ........................................................................... 5

      Sephora's Statement ....................................................................................... 6

D.    Strengths and Weaknesses in Plaintiffs' Case ................................................ 6

      Plaintiffs' Statement ....................................................................................... 6

      Sephora's Statement ....................................................................................... 9

E.    Average Recovery .......................................................................................... 10

F.    Plan of Distribution ....................................................................................... 11

G.    Cash Option ................................................................................................... 11

H.    Gift Card Option ............................................................................................ 12

I.    Notice to the Class ......................................................................................... 14

J.    Response by the Class .................................................................................... 16

K.    Attorneys' Fees .............................................................................................. 16

L.    Incentive Awards ........................................................................................... 21

M.    Proposed Notice ............................................................................................. 22

N.    Proposed Order .............................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Addisu v. Fred Meyer, Inc.*,
    198 F.3d 1130 (9th Cir. 2000) ...................................................................................... 10

*Burden v. SelectQuote Ins. Servs.*,
    No. 10 Civ. 5966 (LB), 2013 WL 3988771 (N.D. Cal. Aug. 2, 2013) ............................ 18

*Cicero v. DirecTV, Inc.*,
    No. 7 Civ. 1182 (AC), 2010 WL 2991486 (C.D. Cal. July 27, 2010) ............................. 19

*Cook v. Niedert*,
    142 F.3d 1004 (7th Cir. 1998) ...................................................................................... 21

*Craft v. Cnty. of San Bernardino*,
    624 F. Supp. 2d 1113 (C.D. Cal. 2008) ......................................................................... 19

*Domino's Pizza, Inc. v. McDonald*,
    546 U.S. 470 (2006) ........................................................................................................ 9

*Estrella v. Freedom Fin. Network, LLC*,
    No. 9 Civ. 3156 (SI), 2012 WL 4645012 (N.D. Cal. Oct. 1, 2012) ................................ 19

*Fleury v. Richemont North America, Inc.*,
    No. 05 Civ. 4525 (EMC), 2008 WL 3287154 (N.D. Cal. Aug. 6, 2008) ........................ 12

*Gilliam v. HBE Corp.*,
    204 F.R.D. 493 (M.D. Fla. 2000) ................................................................................... 9

*Hendricks v. Starkist Co*,
    No. 13 Civ. 0729 (HSG), 2016 WL 5462423 (N.D. Cal. Sept. 29, 2016) ...................... 13

*Hofmann v. Dutch LLC*,
    No. 14 Civ. 02418 (GPC)(JLB), 2016 WL 1644700 (S.D. Cal. Apr. 26, 2016) ............. 13

*In re Bluetooth*,
    654 F.3d 935 (9th Cir. 2011) ....................................................................................... 16

*In re Consumer Privacy Cases*,
    175 Cal. App. 4th 545, 96 Cal. Rptr. 3d 127 (2009) ........................................... 17, 19, 20

*In re Ferrero Litig.*,
    583 Fed. App'x 665 (9th Cir. 2014) ......................................................................... 16, 17

*In re Pacific Enterprises Sec. Litig.,*
    47 F.3d 373 (9th Cir. 1995) ................................................................. 19

*In re Online DVD-Rental Antitrust Litig.,*
    779 F.3d 934 (9th Cir. 2015) ........................................................... 12, 21

*Jackson v. Motel 6,*
    130 F.3d 999 (11th Cir. 1997) ................................................................ 9

*Ketchum v. Moses,*
    24 Cal. 4th 1122, 17 P.3d 735 (2001) ............................................... 17, 20

*Lindsey v. SLT Los Angeles*, LLC,
    447 F.3d 1138 (9th Cir. 2005) ................................................................ 9

*Martin v. AmeriPride Servs., Inc.,*
    No. 8 Civ. 440 (MMA)(JMA), 2011 WL 2313604 (S.D. Cal. June 9, 2011).................. 19

*Rutstein v. Avis Rent-A-Car Systems, Inc.,*
    211 F.3d 1228 (11th Cir. 2000) .............................................................. 9

*Staton v. Boeing Co.,*
    253 F.3d 1180 (9th Cir. 2001) .......................................................... 16, 21

*True v. Am. Honda Motor Co.,*
    749 F. Supp. 2d 1052 (C.D. Cal. 2010) .................................................... 12

*Vizcaino v. Microsoft Corp.,*
    290 F.3d 1043 (9th Cir. 2002) ........................................................ *passim*


**<u>Other Authorities</u>**

42 U.S.C. § 1332(d) ........................................................................ 12

42 U.S.C. § 1453 ........................................................................... 12

42 U.S.C. § 1711 ........................................................................... 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to the Court's Order on December 13, 2016 (Dkt. No. 151), Plaintiffs Ruiqi Ye and Yolin Han (collectively, "Plaintiffs") and Defendant Sephora USA, Inc. ("Defendant" or "Sephora") hereby submit the following joint supplemental brief to Plaintiffs' Motion for Preliminary Approval of Class Action Settlement in advance of the January 19, 2017 hearing.

A.    Size of the Class

Plaintiffs' Statement

The Very Important Beauty Insider ("VIB") Sale that took place from November 5-10, 2014 (the "Sale") was only accessible to Sephora customers who had joined the "Beauty Insider" loyalty rewards program and made minimum purchases throughout the preceding calendar year.[1] That is, to access the 20% off benefit during that time, a Sephora customer would have had to have VIB or VIB Rouge status.  Customers without such status did not receive a percent off discount during the Sale.

According to Sephora's records, approximately 99,000 emails from the Impacted Domains[2] were deactivated during the Sale.  Of those 99,000 accounts, Sephora's records show that 4,659 had VIB Rouge status as of the beginning of the Sale and 10,395 had VIB status as of the beginning of the Sale.  Together, the sum of those accounts comes out to approximately 15,054 accounts.[3] *See* Christensen Decl. at ¶ 11.[4]

---

[1]    In November 2014, there existed three tiers of membership for Sephora customers: (1) "Beauty Insider," a free program for customers to earn rewards and receive promotions, available even if no purchases made; (2) "VIB," for customers who spent between $350 and $999 in one calendar year; and (3) "VIB Rouge," for customers who spent $1000 or more in one calendar year.

[2]    In the Settlement Agreement and corresponding motion for preliminary approval, the parties refer to the three domains that were deactivated as the "Impacted Domains."  Based in China, the three domains are: @qq.com,  @163.com and @126.com.

[3]    The 13,609 figure cited in Plaintiffs' preliminary approval motion was a calculation error. All numbers used herein to quantify the precise number of affected users are approximate numbers based on review of thousands of pages of documents by counsel for Sephora and Plaintiffs.  For

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Of the approximately remaining 84,466 emails that were deactivated, 41,475 merely had Beauty Insider status, and thus were not eligible for the 20% off discount. As such, any purchases they made at Sephora would have been at full price (the same as it would have been every other day of the year).  They did, however, lose access to their accrued points and could not redeem points for rewards during the time that they were deactivated or shop online using their former Sephora account. More than 50% of Beauty Insiders had fewer than 100 points accrued at the time their accounts were deactivated, however, and thus they did not have enough points to redeem a single item.  *See* Sephora Rewards Bazaar, *available at* http://www.sephora.com/rewards (showing that the minimum number of points required to redeem a reward is 100).

The final 42,991 affected emails were identified by Sephora as never having signed up for the Beauty Insider program (designated as "NULL") (the "NULL" accounts), or made any purchases at Sephora through that email.  *See* Dkt. No. 121-5 at ¶ 24 (Declaration of Savio Thattil in support of Opposition to Class Certification).  While those accountholders who had no accounts or made no purchases may have been affected by the deactivation of their accounts during the Sale, as they were not Beauty Insider program members, and therefore not VIB or VIB Rouge members, they did not lose access to the 20% off discount because they never had access to it.  Similarly, because these NULL users never joined the Beauty Insider program, they had no accrued points to lose.

In resolving this action, Plaintiffs agreed to compromise on the scope of the class and the parties focused on accountholders who had economic damages, and thus excluded the NULL

---

purposes of administering the Settlement, Dahl Administration will have access to the documents showing the Impacted Domains.
[4]     All exhibits and paragraphs are referred to herein as "Ex. __" and "¶ __," respectively, and attached to the Declaration of Jeanne M. Christensen.

users.  Because the VIB and Rouge status accountholders lost out on the 20% off discount, the parties agreed to resolve this action with respect to this established group of approximately 15,000 customers, and that is the Class that Plaintiffs seek to certify for purposes of settlement.

Sephora's Statement

Sephora does not join in several of Plaintiffs' assertions. Of the 99,000 accounts from the Impacted Domains, a significant number were generated by bots, not real people. Additionally, it is not accurate that the 41,475 accounts with Beauty Insider status could not redeem points for rewards during the time that they were deactivated or shop online using their former Sephora account. Those customers were only unable to redeem points for rewards on the Sephora website using the particular e-mail address that was affected. Lastly, accountholders who had no accounts or made no purchases were not, and could not have been, affected by the deactivation of their accounts during the Sale. Notwithstanding the foregoing, Sephora agrees that the accurate class count is 15,054. Asdf

B.    Release

The court expressed concern that, as phrased, the release language in the proposed settlement agreement is too broad. The language was::

> all claims or causes of action that are pled in or reasonably related to claims and potential claims Litigation, including but not limited to any and all claims related to the November 2014 20% off sale, the Settlement Class Members' "Beauty Insider" accounts, and any and all breach of contract or related or derivative tort claims against any of the Released Parties.

In particular, the Court was concerned that the language does not appear limited to the claims related to the Litigation and "instead extend to garden variety breach of contract or tort claims that have nothing to do with the conduct described in the complaint." The parties had, in fact, intended to limit the release as the Court suggests it should be by describing the released

claims as "claims or causes of action that are *pled in or reasonably related to* claims and potential claims [in the] Litigation." The phrase "in the" preceding "Litigation" was unintentionally omitted. To further clarify the limitation, the parties have conferred and propose the following changes to the release language (changes appear herein in bold or strike-through for the Court's convenience, but will appear as regular typeface within the amended agreement):

> all claims or causes of action that are pled in or reasonably related to **the** claims and potential claims **in the** Litigation, including but not limited to any and all claims related to the November 2014 20% off sale, the Settlement Class Members' "Beauty Insider" accounts, and any and all breach of contract ~~or related~~ or derivative tort claims **related to the claims and potential claims in the Litigation** against any of the Released Parties.

C.   Maximum Value of the Case: Economic and Compensatory Damages

Plaintiffs' Statement

1.   Economic Harm

At this stage in the litigation and without engaging in the expense and resources of experts to examine potential damages valuations, Plaintiffs estimated economic damages based on the value of the lost discount to Class Members during the Sale. For example, if each Class Member spent $500 during the Sale, each would have saved $100 because they would have received a 20% off discount. Of course, not every Class Member was likely to spend this much because we know that more than two thirds of Class Members had VIB status, which meant that they had not spent more than $350 at Sephora in the entire twelve months before the Sale. For these Class Members, the discount saved was closer to $60. To reach $250 in discount savings, a Class Member would have had to spend at least $1250 during the Sale. As such, an economic damages estimate of $100 to $250 is a generous one that accounts for VIB Rouge high-spenders. See Christensen Decl. at ¶19.

1

2.   Compensatory Harm

2

3          Similarly, without spending resources on experts, it is difficult to assign values to harm

4   for alleged racial profiling.   Based on Plaintiffs' counsel's extensive experience in litigating

5   cases where customers were profiled or denied the ability to shop, an approximate value was

6   assigned that had some relationship to the estimated economic damages.   However, as set forth

7   in the Christensen declaration, Plaintiffs had no tangible evidence that individuals suffered

8   emotional harm beyond their expressed feelings of hurt, frustration and anger at being labeled

9   negatively as resellers based on perceived Chinese nationality.   Christensen Decl. at ¶ 20.

10   Although Plaintiffs allege a degree of public shaming caused by Sephora's Facebook statement

11   and the press about the claimed discrimination, this action differs from cases where individual

12   customers were detained in a store, in front of other customers, and escorted out to the street by

13   security or law enforcement.   Here, we believed it was important to assign a value in order to

14   recognize that some customers of perceived or actual Chinese descent felt victimized based on

15   nothing more than their association with email domains based in China that use Chinese as the

16   default language.

17          Accordingly, Plaintiffs based the compensatory damages estimate on the following

18

19   factors: the race discrimination alleged (1) that took place in a public forum (on Facebook), (2)

20   was directed specifically at stereotypes of Chinese buyers of beauty products, (3) was provided

21   as a so-called explanation for why accounts were deactivated, (4) resulted in the deactivation of

22   only accounts with emails associated with the Impacted Domains, all of which are based in

23   China and have Chinese as the default language, (5) did not specifically name individuals as

24   targets of the discrimination, and (6) did not specifically identify the Impacted Domains as the

25

26

27

28

1

2

targets of the discrimination.  These factors considered collectively, point to recovery for racial

discrimination for settlement purposes in the range of approximately $100 per Class Member.

Indeed, here, Class Members have the option of receiving a gift card coupon in the

amount of $250, a 2.5 multiplier of economic damages or $100 in cash, a 100% to 10%  of a

gross maximum recovery.

Sephora's Statement

Sephora does not join in Plaintiffs' characterization of Sephora's conduct during

discovery. Indeed, Sephora provided appropriate documents throughout the course of discovery.

It has not withheld, nor does it continue to withhold, reasonably discoverable and responsive

information.  Moreover, Sephora continues to deny the allegations in the Complaint, including

that any putative class member suffered any harm as a result of its conduct as alleged in the

action, including economic loss, "public shaming," or supposed damages from racial profiling.

D.      Strengths and Weaknesses in Plaintiffs' Case

Plaintiffs' Statement

Certain strengths exist in this action to establish liability and prove damages. First,

Sephora does not deny that it deactivated all accounts from the Impacted Domains beginning on

November 5, 2014, through late December 2014.  Proof of the blanket deactivations exists

through Sephora's database records and the language contained in the script/code (the "Code")

itself.  Second, a damages assessment could be ascertained in this action by sampling, on a class

basis, past Sale events and average amounts purchased by online shoppers.

Further, because Sephora issued a statement about what happened during the Sale on its

Facebook page and thousands of customers commented on the post, ample evidence about the

event and customer sentiment is available.  Through this evidence, Plaintiffs could show that

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Sephora messaged that "resellers" were responsible for the site's functionality problems and that users reasonably interpreted this message to blame Chinese users for grey market activity that crashed the website.

Despite these strengths, continued litigation presents hurdles for Plaintiffs because this is a highly technical case that involves substantial evidence from Sephora's databases.  To proceed, Plaintiffs would need to obtain this information and then analyze it.  Sephora argues that the IT department's decision to deactivate the Impacted Domains was reasonable based on the data it had in its possession and conclusions made based on the data.  Plaintiffs argue that no such data existed to support the deactivations and that discriminatory bias about Chinese customers and their associated propensity to "resell" in the grey market was the only basis for Sephora to implement the deactivations.  As such, after Plaintiffs obtained all relevant data about what was happening when the Website Crash occurred, they would need to show that no reasonable basis existed for the IT department to recommend deactivating all of the accounts, based on website activity and the different issues reflected in server activity logs.

Even after experts conducted a forensic analysis of the relevant servers, Plaintiffs would need to show that the decision to deactivate was, more likely than not, a discriminatory decision.  Because online sales events are at risk of outages and functionality problems for a multitude of reasons, including excessive volume or malicious attacks, arguably, Sephora's IT department acted reasonably based on what it believed to be heightened account creation from the Impacted Domains.  Accordingly, in the face of a number of defenses, Plaintiffs had the burden to show the decisions were not reasonable.  To do so, experts must be retained.  Those experts would assess the state of Sephora's database before, during, and after the Sale to verify whether there was heightened account creation, whether such heightened account creation was limited to the

Impacted Domains, and whether such account creation would have caused the website to "crash." This is a time-consuming and expensive process. Presumably, Sephora would also retain experts to review the same information. Experts for both sides would need to provide opinions about the cause(s) of the underlying Website Crash and whether the steps taken by IT to restore functionality were reasonable under the circumstances. Moreover, as part of the reasonableness assessment, through experts, Plaintiffs would have to demonstrate that numerous, less damaging, measures were available to the IT department but that it failed to pursue these options.

In addition to arguing that the IT department shut down the Impacted Domains due to prejudiced beliefs that Chinese customers were out to "game" the Sale for individual profit, Plaintiffs argued that such bias about Chinese customers existed throughout the ranks of Sephora executives and that senior employees ratified the unlawful decisions by the IT department. Specifically, Plaintiffs claimed that it was no secret among Sephora employees that the Company engaged in actions to control the supply and demand of certain products to the Chinese market, and that it was worried about an increase in reselling there. Allowing substantial products to be purchased during the Sale and then sold in the grey market to China could hurt Sephora's bottom line. To prove this, Plaintiffs would rely on documentary evidence from Sephora but would also depose high level executives of Sephora and its suppliers which are luxury beauty products brands. Sephora likely would have sought to quash those subpoenas, and the parties would have had to seek Court intervention through the litigation of various motions.

Based on the relevant case law for claims pursuant to Sections 1981 and 1982, Plaintiffs faced an additional hurdle on the issue of whether the Court would require each Class Member to show that she "intended" to make a purchase during the Sale but was denied. Plaintiffs argued

that collectively, all Class Members were equally damaged because it would be impossible to evidence intent to purchase when Sephora unilaterally deactivated all Impacted Domains before the Sale began on November 5, 2014.  Based on the unique facts of this online sale event, as opposed to cases involving retail establishments where customers were physically prevented from making a purchase, this action presented a novel argument on whether Rule 23 was an available mechanism for resolution pursuant to Sections 1981 and 1982.  Sephora vigorously disputed that Plaintiffs could establish liability, much less damages, on a classwide basis. Absent settlement, it is anticipated that this issue would be extensively litigated and as with most cases, the risk of losing on these claims is tangible.

Defendant's Statement

Plaintiffs face a number of serious challenges in this litigation.  Under existing authority, it is extremely difficult to get a class certified.  Courts are generally hesitant to certify consumer class actions under § 1981.  *See, e.g.*, *Rutstein v. Avis Rent-A-Car Systems, Inc.*, 211 F.3d 1228, 1239 (11th Cir. 2000) (denying class certification because individual issues as to intentional discrimination predominated); *Jackson v. Motel 6*, 130 F.3d 999, 1006 (11th Cir. 1997) (holding that consumer class action claims under § 1981 turned on "highly specific factual issues" and denying certification because individual issues predominated); *Gilliam v. HBE Corp.*, 204 F.R.D. 493, 496 (M.D. Fla. 2000) (recognizing "the virtual impossibility of certifying a class in a non-employment civil rights case where class members seek compensatory and punitive damages"). Non-employment § 1981 claims require an "attempt to contract" on the part of the plaintiff. *Lindsey v. SLT Los Angeles*, LLC, 447 F.3d 1138, 1145 (9th Cir. 2005) (emphasis added); *see also Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (holding defendants must be persons who "sought to enter into contractual relationships") (internal citations omitted).

Although the Ninth Circuit has not squarely addressed the issue, many other circuits require plaintiffs to demonstrate they made affirmative acts toward completing a purchase.   This requirement would be extremely difficult to prove on a class-wide basis and raises concerns regarding commonality.

Ultimately, even if the class were certified, Plaintiffs would face several significant hurdles in carrying their burden on the merits.  The Ninth Circuit has squarely held that resellers cannot recover in a § 1981 case.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1137-38 (9th Cir. 2000).  To the extent that Plaintiffs or any class member engaged in reselling, their claims are not cognizable.   Furthermore, Sephora believes there is no evidence of any intentional discriminatory conduct directed at the putative class members, and as a matter of law a disparate impact claim cannot proceed in this case. These hurdles, among others, are risks that should be taken into account when assessing the relative strengths of this action.

E.      Average Recovery

Plaintiffs estimate that the average recovery per Class Member will be in the range of $88-$125 (due to the cap) for individuals who elect to receive cash, and $177-$250 (due to the cap) for individuals who elect to receive gift cards.  Upon consultation with Dahl, the Claims Administrator selected by the parties in this Action, it is estimated that approximately 15% of Class Members will make claims.  Dahl further estimated that a substantially high response rate would be no more than up to 25% of Class Members.  As for whether Class Members will select the cash option or the gift card option, Dahl estimates that approximately 50-75% of Class Members who make claims will select gift cards.  The above ranges are based on the following calculations.

| percent of class claiming | percent cash electors | approximate cash award | percent gift card electors | approximate gift card award |
|---|---|---|---|---|
| 25% | 75% | $ 86.40 | 25% | $ 172.79 |
| 25% | 85% | $ 93.91 | 15% | $ 187.82 |
| 20% | 75% | $ 108.00 | 25% | $ 215.99 |
| 20% | 85% | $ 117.39 | 15% | $ 234.77 |
| 15% | 75% | $ 143.99 | 25% | $ 287.99 |
| 15% | 85% | $ 156.51 | 15% | $ 313.03 |

F.    Plan of Distribution

The Court asked the parties to explain why, under the agreed-upon plan of distribution, there is a maximum amount set for the cash and gift-card options.  The parties agreed to set a maximum amount for the cash and gift-card options because if a relatively small number of class members submit claims and the amount is not capped, class members could be paid an award that is totally disproportionate to the harm suffered.  The parties sought to avoid this windfall-scenario by simply capping the maximum amount any one class member can receive.

G.    Cash Option

The Court asked the parties to explain why the settlement agreement provides that after 180 days, a check written to a class member "may be cancelled" and "[i]f cancelled, the value of [the] check[] will be distributed" to a cy pres beneficiary.  The parties provided that checks "may" be cancelled after 180 days only to acknowledge that these checks may not be cancelled precisely on the 181st day after they are issued, and to provide some flexibility to Sephora with regard to exactly when these checks are cancelled.  However, at some point after 180 days, all uncashed checks will be cancelled, and the proceeds will be distributed to a *cy pres* beneficiary (the National Asian Pacific American Women's Forum).  There will not be any reverter to Sephora for the value of any of these checks.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

H.     Gift Card Option

The gift card option does not make this settlement, in whole or in part, a "coupon settlement" within the meaning of the Class Action Fairness Act ("CAFA"), Pub. L. 109-2, 28 U.S.C. §§ 1332(d), 1453, 1711 *et seq.*  The Ninth Circuit has distinguished gift cards from coupons, and held that settlements that include the former are not subject to CAFA's coupon settlement provisions.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015).  In so holding, the court analyzed the legislative history of CAFA in detail and noted that coupon settlements were subject to additional scrutiny because they generally "involve a discount—frequently a small one—on class members' purchases from the settling defendant." *Id.* at 951 (citing S. Rep. No. 109-14, at 15-20).  The Court further distinguished gift cards from coupons that merely afford "discounts [that] require class members to hand over more of their own money before they can take advantage of the coupon, and [ ] often are only valid for select products or services."  *Id.*; *see also id.* (citing *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1069 (C.D. Cal. 2010); *Fleury v. Richemont North America, Inc.*, No. 05 Civ. 4525 (EMC), 2008 WL 3287154, at *2 (N.D. Cal. Aug. 6, 2008) (internal quotation marks omitted) (noting that "coupons offer only a discount on another product or service offered by the defendant in the lawsuit").  Finally, the court noted that any concerns were allayed where the settlement afforded claimants "the option of obtaining cash instead of a gift card, undercutting the argument that the settlement force[d] them to buy from the defendant."  *Id.* at 952.

The Settlement in this case affords claimants the option of receiving cash *or* a Sephora electronic gift card that can be used to purchase any item offered at either www.sephora.com or at a Sephora owned and operated retail location in the United States.  In addition, if the claimant chooses the gift card option, the gift cards can be used to pay any applicable sales tax or shipping

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

charges and are freely transferrable.  *See* Dkt. No. 147-2 ¶¶ 3.4-3.5.  If the Court approved all requested deductions from the gross Settlement Amount of $950,000, and every one of the estimated 13,869 class members submitted a claim form seeking the same type of recovery (cash or gift card), each would receive $29.31.  Sephora sells hundreds of items that can be purchased in their entirety for this amount, such that even claimants who elect the gift card option would not be required to expend any of their own money to receive Sephora merchandise.  If the claim rate is lower, each claimant electing a gift card could receive as much as $250.00.  Claimants would be allowed to purchase from Sephora any product of their choosing with their gift cards.  And those who did not want to receive additional merchandise from Sephora could always elect the cash option instead.

Accordingly, the gift card option included in this settlement does not convert it into a "coupon settlement" within the meaning of CAFA, under the standards clearly established by the Ninth Circuit.  *Accord Hendricks v. Starkist Co*, No. 13 CV 00729 (HSG), 2016 WL 5462423, at *7 (N.D. Cal. Sept. 29, 2016), appeal filed Nov. 8, 2016 (rejecting characterization of settlement as a CAFA coupon settlement where the vouchers offered had "sufficient value to allow Class Members to obtain product without spending their own money" and Class Members "were given a choice between receiving a cash settlement or the vouchers"); *contrast Hofmann v. Dutch LLC*, No. 314CV02418GPCJLB, 2016 WL 1644700, at *5 (S.D. Cal. Apr. 26, 2016) (finding $20 "gift card" offered as sole form of compensation in case where average price of product was $205 indicative of CAFA coupon settlement).  It is also permissible for the agreement to allow claimants to select a gift card worth twice what they could otherwise elect to receive in cash, particularly given that the claims in this case arise out of the alleged inability of class members who **wanted** to purchase products from Sephora to be able to do so.  *See Hendricks*, 2016 WL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

5462423, at *5 (approving settlement of claims alleging underfilling of Starkist tuna cans that allowed claimants to elect cash recovery of $1.97 per claim or voucher recovery of $4.43 per claim).

Finally, it is permissible for the settlement to provide that gift cards not used within one year of issuance will expire. This is appropriate given the accounting and other record-keeping difficulties that would attend open-ended gift cards. It no more constitutes an implicit reverter to Sephora than does any settlement involving vouchers or gift cards, where claimants may forget or chose not to redeem their distribution from the settlement. It is also fair and reasonable because claimants here can elect to receive cash instead, and further because each class member is—by definition—already a loyalty rewards program member of Sephora with an established history of purchasing substantial quantities of product each year. There is no reason to believe that any significant number of claimants who elect to receive gift cards will fail to utilize those gift cards before the expiration period. Accordingly, the settlement merits approval as negotiated and drafted by the parties.

I.    Notice to the Class

The Court expressed concerns that providing notice to class members via email and on Sephora's Facebook page may not be the best notice practicable under the circumstances. The parties originally agreed to provide notice in this manner, and not via mail, because Sephora does not have records of clients' mailing addresses; it only has shipping and billing addresses. However, if the Court prefers a mailing in addition to notice by e-mail, the parties have no objection. The parties have conferred and agreed that notice will be provided to class members' billing addresses (in addition to email addresses and via Sephora's Facebook page), to the extent that Sephora has access to this information.

- The cost of notice by mail, along with standard skip-tracing, will cost an additional estimated $10,000. During settlement negotiations, Sephora sought to limit the amount spent on claims administration, which factored into the request for approval of email-only notice. Plaintiffs do not object to providing notice by mail but note that this would alter the agreed upon distributions of the Settlement.

- The Court enquired whether the parties had "discussed a 'reminder' notice if a class member has not responded to the class notice by a certain date in advance of the deadline for submitting a claim, objecting, or opting out." The parties have conferred and have no objection to a reminder notice. The parties, however, propose that the reminder notice be limited to an e-mail notice to order to lower the costs associated with providing notice and maximize the amount of settlement dollars available to the class.

- The Court asked whether notices will be sent to all of the email addresses provided to Sephora by a class member. Notice will be sent to the most recent email address associated with each class member's Beauty Insider account ("BI account"). However, notice will not be sent to every email address a class member provided to Sephora in the past, as Sephora does not keep a record of clients' previous email addresses once they update the email address they would like associated with their BI account. Additionally, some class members may have given Sephora multiple email addresses, each associated with a different BI account. Notice will not be sent to the email addresses associated with class members' other BI accounts that were not affected by the "script" and are not the subject of this litigation.

- With regard to email notice, the Court asked if the claim form and opt-out form can be included as attachments to the email, in addition to including links to these forms in the body of the email. While it is in theory possible to include the claim form and opt-out form as attachments to the notice-email, the parties do not believe that this is the best option. The reason is that the parties were informed by the claims administrator that including the claim and opt-out forms as attachments makes it more likely that the email will be directed to class members' "junk," "spam," or "bulk" email folders without their knowledge. For this reason, the parties prefer to provide access to the claim form and opt-out form through a link only. For purposes of examples only, the following are two active class settlement sites administered by Dahl that demonstrate the accessibility of information and the ability to fill out forms online and submit rather than writing and sending back via US mail: www.WENClassSettlement.com; www.BetterBodySettlement.com.

- The Court enquired what Sephora will post on its Facebook page. The parties propose the following language (items bolded and underlined represent hyperlinks that will connect the user to the settlement website):

A settlement ("**Settlement**") has been proposed in the class action lawsuit pending in the Northern District of California ("Court") entitled *Lee, et al. v.*

*Sephora USA, Inc.* (the "Action"). For more information on the terms of the settlement and whether you might qualify to receive a cash payment or a voucher/gift card under the terms of the Settlement, click **HERE**.

The parties propose users that click either the **Settlement** or **HERE** hyperlink are directed to the settlement website where all information regarding the claims process shall appear.

J.   Response by the Class

The Court asked whether class members may respond to the notice by mail, as suggested by the proposed notice.  Yes, the parties will agree that class members may respond to the notice by mailing a response to Sephora Claims Administrator c/o Dahl Administration, P.O. Box 3614, Minneapolis, MN 55403-0614.

K.   Attorney's Fees

Plaintiffs offer the following with respect to the questions regarding attorneys' fees. Sephora does not join in this section.

Although federal and state courts in California sometimes refer to 25% of a settlement fund as the default "benchmark" for an attorney's fees award in the Ninth Circuit, *see Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-48 (9th Cir. 2002); *In re Bluetooth*, 654 F.3d 935, 942 (9th Cir. 2011), case law makes clear that the 25% benchmark is simply a starting point.  District Courts have the discretion to award attorneys' fees using the lodestar method and courts adjust fee awards based on the particular circumstances of a given case and frequently award fees greater than 25%.  *See In re Ferrero Litig.*, 583 Fed. App'x 665 (9th Cir. 2014) (citing *Staton v. Boeing Co.*, 327 F.3d 936, 968 (9th Cir. 2003).  An award greater than 25% is warranted in this case.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here, the amount of fees requested is justified by relevant factors such as the result obtained for the Class, the novelty of the issues presented, the effectiveness of counsel's legal representation, and the contingent risk involved.  *See In re Ferrero Litig.*, 584 Fed. App'x at 668 ("fees are calculated through an assessment of time expended on the litigation, counsel's reasonable hourly rate and any multiplier factors such as contingent representation or quality of work"); *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132-33, 17 P.3d 735 (2001) (describing these as factors to be considered in determining a reasonable fee award); *In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 556, 96 Cal. Rptr. 3d 127, 135 (2009) (same); *Vizcaino*, 290 F.3d at 1048-50 (identifying similar factors as relevant in adjusting the percentage of the fund).

Counsel represented Plaintiffs and the proposed Class on a contingent basis.  *See* Christensen Decl. at ¶ .  A substantial number of attorney hours and resources were expended on this litigation by counsel for Plaintiffs that ultimately resulted in a meaningful settlement and resolution. *Id.*, *see also* Exs. 1, 2.  Given the multitude of reasons for the functionality of a website to be impacted during the initial hours of an online sales event, and the fact that unquestionably thousands of customers flocked to the online discount Sale, Plaintiffs assumed substantial risk by moving forward with their allegations that discriminatory intent formed the basis for the actions taken to restore website functionality.  Indeed, the case presented novel issues as a proposed Rule 23 Class alleging racial profiling and discrimination claims pursuant to Sections 1981 and 1982 on behalf of a nationwide customer basis.

The action involved complex information technology issues that required Plaintiffs' counsel to be well versed and educated regarding online retailing, Distributed Denial of Service attacks, cyber security, and commercial database management and operation, as well as other issues including, but not limited to, Sephora's fraud detection software, its website traffic

monitors and more.  Christensen Decl. at ¶ 28. In fact, without such specialized knowledge, counsel likely would have been unable to properly assess the risks of litigation in the first place. Moreover, given the complexities of the data, discovery review and evaluation could not be tasked to junior lawyers or paralegals, thereby demanding partner and associate time to review more than 95% of the discovery.  *Id.*  And Sephora produced nearly 10,000 pages of documents, many of which contained database information.  Understanding of databases and how they deadlock, servers, bots, web traffic and Sephora's fraud system were critical at all stages of this litigation in order to assess properly whether Sephora complied with discovery requests, whether more data needed to be produced and why.  Ultimately, this knowledge was necessary for counsel to arrive at a reasonable settlement range and advise Plaintiffs.

Because of the contingency nature of the claims, counsel undertook this action to the exclusion of other paying work, devoting substantial time and out of pocket expenses.[5]  Here, rather than devoting time to other matters, counsel aggressively litigated Plaintiffs' claims, devoting more than 1250 attorney hours.  *Id.* at ¶ 22. Significantly, counsel expended almost $90,000 to date in out of pocket expenses, an amount that is approximately 22% of the total amount of legal fees they are seeking.  This is a substantial investment in Plaintiffs' claims and demonstrates an uncommon commitment and dedication by the law firms representing the proposed Class.

Finally, in cases such as this, where individual Class members' total damages are small relative to the fees needed to recover any damages, an award of a much higher percentage for legal fees is common.  *See e.g.*, *Burden v. SelectQuote Ins. Servs.*, 10 Civ. 5966 (LB), 2013 WL

---

[5]     *See* Christensen Decl. at ¶ 34, and Ex. 4, explaining that in an October 2016 fee application in the United States District Court for the Southern District of New York, that counsel included a recent retainer of an hourly client who paid $850 and $350-650 for associate time.

3988771, at *5 (N.D. Cal. Aug. 2, 2013) ("Awarding fees at a rate higher than the 25% benchmark is appropriate in cases involving a relatively small settlement fund."); *Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1127 (C.D. Cal. 2008) ("Cases of under $10 Million will often result in . . . fees above 25%."); *In re Consumer Privacy Cases*, 175 Cal. App. 4th at 557-58 ("the ultimate goal is the award of a reasonable fee to compensate counsel for their efforts, irrespective of the method of calculation"); *Vizcaino*, 290 F.3d at 1047, 1050 (in settlement of $96,885,000, the Ninth Circuit affirmed a fee award of 28%, $27,127,800); *In re Pacific Enterprises Sec. Litig.*, 47 F.3d 373 at 378-79 (affirming an award equal to one-third of the $12 million settlement fund); *Estrella v. Freedom Fin. Network, LLC*, No. 9 Civ. 3156 (SI), 2012 WL 4645012, at *3 (N.D. Cal. Oct. 1, 2012) (awarding $633,333 from $1.9 million settlement fund).

Even within the wage and hour context, a California court reviewed fee awards and found that "courts usually award attorneys' fees in the 30-40% range in wage and hour class actions that result in recovery of a common fun[d] under $10 million." *Cicero v. DirecTV, Inc.*, No. 7 Civ. 1182 (AC), 2010 WL 2991486, at *6 (C.D. Cal. July 27, 2010); *see also Martin v. AmeriPride Servs., Inc.*, No. 8 Civ. 440 (MMA)(JMA), 2011 WL 2313604, at *8 (S.D. Cal. June 9, 2011) ("courts may award attorney's fees in the 30–40% range in wage and hour class actions that result in recovery of a common fun[d] under $10 million").   As such, based on the reasonable estimates of full recoveries by individuals who sued Sephora in stand-alone cases throughout the country, in conjunction with the reasonable value of legal fees to achieve a successful result, Plaintiffs' counsel's fee is fair.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**The Proposed Fee Amount Is Reasonable Under A Lodestar Cross-Check.**

Plaintiff's counsel's lodestar exceeds the fee amount requested.  Courts regularly use the lodestar method for calculating fees in class settlement cases to "cross-check" the results of one method against the other.  *See, e.g.*, *Vizcaino*, 290 F.3d at 1050 ("[W]hile the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award."); *In re Consumer Privacy Cases*, 175 Cal. App. 4th at 557.  The lodestar is calculated based on reasonable hours at prevailing hourly rates for each attorney.  *Ketchum*, 24 Cal. 4th at 1131-32.  Those rates reflect "the general local hourly rate for a fee-bearing case" and do "not include any compensation for contingent risk, extraordinary skill, or any other factors."  *Id.* at 1138.  The lodestar can be adjusted or enhanced based on various factors, which constitutes a multiplier.  *Id.*  at 1132; *see also Vizcaino*, 290 F.3d at 1051 (multiplier may be applied to lodestar in common fund case based on factors such as "the complexity of th[e] case, the risks involved and the length of the litigation").

Here, a lodestar cross-check confirms that the percentage requested is reasonable and fair.  Indeed, the requested fees of $580,625 at NY rates, which even when discounted by fifteen percent, is $493,008.  *See* Christensen Decl. at ¶22, *see also* Ex. 1.  A reasonable estimate of 100 hours going forward, even at the discounted rate, equals another $41,000.  Importantly, counsel will perform additional work in the future, including moving for final approval and responding to class member inquiries about the settlement.  Indeed, since the settlement conference before Judge Corley, through the negotiation of the final agreement, contacting and working with claims administrator, drafting proposed notices, the motion for preliminary approval and the associated orders, counsel has expended more than 190 hours.  Based on past fee applications in class actions, Plaintiff's counsel reasonably anticipates expending another 100 hours and $5,000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

in out of pocket costs to finally resolve and conclude this action.  As detailed in the Christensen Declaration and the exhibits attached, even at discounted rates accounting for the fee differences between Manhattan and San Francisco, counsel's lodestar is well below the fees ultimately incurred in in  order to successful resolve and finalize this action.  Christensen Decl. at ¶ 21-32, Exs. 1, 2.

L.      Incentive Awards

        Plaintiffs offer the following with respect to the Court's questions regarding incentive awards.  Sephora does not join in this section.

        Courts in the Ninth Circuit consider two general factors in assessing the fairness of an incentive award.  First, Courts are expected to consider the number of class representatives, the average incentive award amount, and the proportion of the total settlement that is spent on incentive awards.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) (approving incentive awards where named plaintiffs received $5,000 awards, while class members received $12 individual awards).  Here, there are only two class representatives, the average incentive award amount is low, and the proportion of the total settlement spent on incentive awards is approximately 1.05%.

        Second, Courts look to whether a plaintiff's efforts justify a particular award, looking to whether a plaintiff has taken steps to preserve the interests of the class, the degree to which the class benefitted from the plaintiff's actions, the time and effort the plaintiff expended through the course of litigation, and fear of retaliation.  *See Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (citing *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)).  Here, both named Plaintiffs were involved actively in all phases of this litigation, providing information during Plaintiffs' counsel's pre-filing investigation, produced documents, participated in discovery and were each

subject to a daylong deposition.  Ms. Han traveled to the mediation before Judge Infante and also traveled to San Francisco for the settlement conference on August 24, 2016.  Class Members also stand to benefit substantially from Ms. Ye's and Ms. Han's actions.  The settlement that they participated in negotiating provides for substantial awards to Class Members, taking into account economic and compensatory damages, and the strong likelihood that not all Class Members will make claims.  *See* Section E, *supra*.  While the Court is correct that the named Plaintiffs face a lower risk of retaliation due to the nature of this case, the other factors weigh in favor of an award to Plaintiffs Ye and Han because of their diligence and commitment to the prosecution of this action.

As such, while we will brief more extensively the proposed incentive awards to Ms. Ye and Ms. Han in any final approval motion, these awards warrant approval as negotiated and proposed by the parties.

M.    Proposed Notice

The proposed notice has been modified to address the Court's concerns.  *See* Ex. 8. Furthermore, the proposed notice will also include a link to a website that will include a full explanation of the categories of information enumerated in the Order.  *See* Ex. 9 (the information that will be uploaded to the website).

N.    Proposed Order

The parties hereby attach a revised Proposed Order as instructed by the Court in redline (Ex. 5) and in final form (Ex. 6).

Respectfully submitted,

Dated: December 23, 2016                WIGDOR LLP

By: _____s/ Jeanne M. Christensen_____
JEANNE M. CHRISTENSEN
Attorneys for Plaintiffs
Ruiqi Ye, Yolin Han

Dated: December 23, 2016                ORRICK, HERRINGTON & SUTCLIFFE  LLP

By: _____s/ Andrew R. Livingston_____
ANDREW R. LIVINGSTON
Attorneys for Defendant
Sephora USA, Inc.

## ATTESTATION OF CONCURRENCE

I, Jeanne M. Christensen, as the ECF user and filed of this document, attest pursuant to N.D. Cal. Civil L.R. 5-1(i)(3) that concurrence in the filing of this document has been obtained from each of the above signatories.

Dated: December 23, 2016
New York, New York

By: _____s/ Jeanne M. Christensen_____
JEANNE M. CHRISTENSEN, ESQ.