DOUGLAS H. WIGDOR (NY SBN 2609469)
JEANNE M. CHRISTENSEN (NY SBN 2622124)
ELIZABETH J. CHEN (NY SBN 5126214)
(All admitted *pro hac vice*)
**WIGDOR LLP**
85 Fifth Avenue
New York, NY 10003
Tel.: (212) 257-6800
Fax: (212) 257-6845

JAMIE C. COUCHE (SBN 252001)
**ANDERSON & POOLE, P.C.**
601 California Street, Suite 1300
San Francisco, CA 94108
Telephone: (415) 956-6413
Facsimile: (415) 956-6416

Attorneys for Plaintiffs,
**RUIQI YE, YOLIN HAN**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUIQI YE and YOLIN HAN, individually and on behalf of all other similarly-situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>SEPHORA USA, INC.,<br><br>Defendant. | Case No.: 3:14-cv-05237-EMC<br><br>**DECLARATION OF JEANNE M. CHRISTENSEN IN SUPPORT OF JOINT SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND UNOPPOSED PROVISIONAL GRANTING OF CLASS ACTION CERTIFICATION** |

I, Jeanne M. Christensen, pursuant to 28 U.S.C. § 1746, declare:

1. I am a Partner at the law firm Wigdor LLP, and together with Anderson & Poole, P.C., represent Plaintiffs in the above-captioned action and the prospective class herein, and as such, am fully familiar with all the facts, circumstances, and proceedings herein.

2. I am an attorney admitted *pro hac vice* in the Northern District of California and am counsel of record for Plaintiffs Ruiqi Ye and Yolin Han ("Plaintiffs" or "Named Plaintiffs") in this action.

3. I have personal knowledge of the facts set forth herein and submit this declaration in support of the joint supplemental brief ("Joint Brief") filed in response to the Court's December 13, 2016 Order (Dkt. No. 151) directing the parties to supplement Plaintiffs' Motion for Preliminary Approval of Class Action Settlement.

4. Specifically, the Court asked for further information on a number of issues important to an assessment of preliminary approval of the settlement and conditionally certifying the proposed class for this purpose, including:

   a. Class Size;
   b. the Release;
   c. Estimated Maximum Value of the Case,
   d. Strengths and Weaknesses in Plaintiffs' Case,
   e. Average Estimated Recovery per Class Member;
   f. Plan of Distribution,
   g. Cash Option
   h. Gift Card Option;
   i. Email Notice to the Class;
   j. Projected Class Response Rate;
   k. Attorneys' Fees and Costs;
   l. Incentive Awards; and
   m. Issues relating to the Content of the Proposed Notice.

5. Below, I address the topics where information in addition to that provided in the Joint Briefing is needed, and identify relevant exhibits attached hereto.

## CAFA Notification

6. The Court inquired about CAFA notification. The parties have considered that CAFA notice (28 U.S.C. § 1715) requirements are necessary here. Specifically, when I negotiated with the claims administrator, Dahl Administration, LLC ("Dahl"), we included the

cost of CAFA notice to all 50 states. However, we did not intend to go live with the website for the settlement administration until the Court granted preliminary approval. The site will be one of the following domains: http://sephoravibsettlement.com/, http://sephoraclassaction.com/ or http://sephorabeautyinsidersettlement.com/. Waiting for preliminary approval before posting the site prevents having to expend unnecessary costs on the day-to-day administration of the website and helps reduce CAFA notice costs where reference to pleadings can be provided via the website rather than mail, which reduces costs for printing, copying and postage. Moreover, Plaintiffs believed it was prudent to have Court approval as to the contents of the Class Notice.

7. However, Dahl is ready to issue the CAFA notices and Plaintiffs will work with Dahl to accomplish notice prior to the scheduled hearing date before the Court of January 19, 2017. As such, the Final Approval Hearing can be scheduled for 90 days following initial approval pursuant to 28 U.S.C. § 1715 (b) and (d).

### Class Size

8. As explained in the Joint Brief, Plaintiffs and Sephora initially believed that approximately 99,000 or more email addresses were deactivated during the online sale event scheduled for November 6-10, 2014 (the "Sale"). Initially, Plaintiffs were not sure whether each email address corresponded to an individual customer or whether some customers had more than one associated email address with Sephora. Further, Plaintiffs were unaware of whether the code implemented by Sephora (the "Code") deactivated only certain emails, for example, those active in 2014, or emails active during a certain time period before the Sale, such as 2010-2014, or whether the Code applied to some membership levels but not others.[1]

---

[1] In November 2014, there existed three tiers of membership for Sephora customers: (1) "Beauty Insider," a free program for customers to earn rewards and receive promotions,

9. Only after Sephora was able to recover from its databases the list of emails showing the actual addresses deactivated by the Code were the parties able to understand that the Code picked up all email addresses on record with Sephora from @qq.com, @163.com and @126.com (the "Impacted Domains"). However, the data also allowed the parties to discern with some certainty when a particular email was last used.

10. Subsequently, the parties determined how many emails were (i) associated with VIB and VIB Rouge customers at the time of the Sale, and (ii) associated with Beauty Insiders only, which allowed a calculation of an approximate number of online accounts that were able to access and participate in the Sale.

11. As explained in the Joint Brief, the number of emails for VIB and VIB Rouge members was estimated to be slightly more than 15,000, far below the initial class size estimate of 99,000.

12. Moreover, the documents showed that almost 43,000 emails were not associated with any tier of the Beauty Insider membership program (the "NULL" emails), thereby excluding such emails from the Sale completely.

13. In the event the Court wishes to view some sample pages of data showing the existence of the NULL emails versus active VIB emails, Plaintiffs can easily provide such documentation.

**Estimated Maximum Recovery of Damages**

14. Because the parties resolved this action while Plaintiffs' motion for class certification was pending, the parties have not engaged in class wide discovery nor have

---

available even if no purchases made; (2) "VIB," for customers who spent between $350 and $999 in one calendar year; and (3) "VIB Rouge," for customers who spent $1000 or more in one calendar year.

Plaintiffs expended significant resources to locate and obtain information from other potential VIB and VIB Rouge members whose emails were deactivated during the Sale. Accordingly, estimates about damages were made based on information available online, such as through the Facebook comments and Reddit threads, and information from Hyejin Lee and the two remaining Named Plaintiffs. Based on these resources, Plaintiffs' counsel believed that average customers using emails from the Impacted Domains would have spent between $100-$800 during the Sale, thereby receiving 20% discounts in the range of $20-$150. Moreover, it appeared that most potential Class Members had between 100-1500 redeemable points, with most falling on the lower end.

15. For example, Plaintiff Ye had approximately 365 points available to redeem at the time of the Sale, and had never spent more than $82.62 in one online purchase in the months prior to the Sale. For the same online annual sale event in 2013, Hyejin Lee had approximately 2616 points available to redeem in addition to her 20% discount. Based on Plaintiffs' counsel's calculations from the numerous promotions that were running in November 2014, a 100-point reward was worth approximately $10 or less.

16. Additionally, on November 6, 2014, Plaintiff Han attempted to access the Sale and make purchases that totalled $142.00, thus potentially providing her a 20% discount of $28.40.

17. Further, in the weeks before and after filing this case, when I was contacted by individuals with emails from the Impacted Domains who alleged that they were blocked from the Sale, I discussed their respective points available in November 2014 and amounts of their attempted purchases. Based on these discussions, by way of example, I am aware of customers

who had 100 points, 935 points and 1230 points. I did not encounter any one with substantially more points than Ms. Lee.

18. Also, by way of example, I spoke to a customer who had spent approximately $37.00 on products in the months prior to the Sale, as well as another person who tried to spend $834.00 during the Sale but was prevented by the deactivation. I spoke to another person who told me that, on average, she spent between $300-$400 when she made an online purchase. These people were willing to answer some of my questions and talk about what happened, but they were not willing to actively participate in the litigation, for individual claims or in connection with a proposed class, and as such this information was not part of any formal discovery exchange. However, to the extent I have emails or other records of these conversations, I can provide them to the Court *in camera* if requested.

19. From these discussions, it did appear that individuals who made the effort to sign up for the Beauty Insiders rewards program, track purchases and points in order to receive promotional coupons worth between $5-$25 were not consumers spending thousands of dollars as part of a single online order, regardless of VIB status. This provides context for the reasonableness of an estimated recovery, even if fully successful on all claims, of economic damages in the range of the Settlement. For instance, in order to receive a 20% discount worth $250, a customer would have attempted to spend at least $1,250 during the online Sale. I have not reviewed any data that would suggest such an amount was typical and in fact, my review indicates that average consumers spent substantially less.

20. Notably, I did not obtain information from any person with a deactivated email during the Sale who reported emotional damages to such a degree that they sought treatment through counseling or medication. As Named Plaintiffs testified at their depositions, while they

were upset from what they perceived as racial profiling by Sephora, the harm did not manifest into physical symptoms such as headaches, nausea or other physical ailments associated with emotional trauma in discrimination cases. Accordingly, absent expert testimony on ascertainable emotional damages, I believed that assigning a value with a relationship to the estimated economic damages was fair and reasonable under the circumstances of this case.

## Attorneys' Fees and Costs

21. Counsel represented Plaintiffs and the proposed Class on a contingent basis.

22. In addition to the information in the Joint Brief, attached hereto is a chart providing hourly rates, hours incurred through December 20, 2016, and estimated future time. I also provide a chart with costs through the present and broad categories of expense items. *See* **Exhibit 1 and Exhibit 2**.

23. Based on the available information about hourly attorney's fees being higher in Manhattan than San Francisco, I included in the chart our fees at a discounted rate of 15%.

24. While the attorneys and paralegals diligently track our time, our firm has limited admin staff and it is possible that not all time has been transferred from written calendars to our time tracking software. Therefore, these charts are estimated to date but could increase when a final accounting is done between now and the filing of our formal attorneys' fees motion. Further, we do not assign categories to time entries by task that would allow us to easily calculate what major tasks required a certain amount of hours. However, because we include detailed descriptions of the activities engaged in for each entry, I was able to review the majority of the time records and estimate overall hours for certain stages of the litigation.

25. As indicated in **Exhibit 3**, it is fair to estimate that counsel devoted approximately 5% of our total time to pre-filing matters, drafting and filing the complaint;

approximately 15% of total time to initial discovery, and discovery targeted to mediation, including depositions of a senior IT executive and Fraud department Executive, mediation with Judge Infante, and post-mediation follow-up negotiations; approximately 40% of total time to full discovery, including extensive review of documents by counsel, and multiple meet and confers about discovery disputes with opposing counsel, discovery motion practice, prep and depositions of named plaintiffs; approximately 20% of total time on discovery targeted to the class certification motion and preparing and filing the class certification motion and reply; approximately 5% of total time preparing for the settlement conference before Judge Corley; and approximately 15% of total time finalizing the settlement agreement, drafting and editing proposed notices, proposed orders, selecting claims administrator and drafting and finalizing the motion for preliminary approval. Additionally, counsel has spent substantial time preparing this supplemental briefing and reviewing time records.

26. Based on time spent in this case and time incurred working on final approval motions in other matters, it is fair to estimate that we will spend at least another 100 or more hours finalizing this settlement.

27. Despite fees and costs above 25% of the gross settlement, counsel for Plaintiffs achieved an exceptional and meaningful recovery for potential Class Members. Indeed, as set forth above and in the Joint Brief, no tangible data existed to support a claim that, even if the case was fully litigated and Plaintiffs succeeded in proving all of their claims, would a full damages recovery be much higher than the agreed to amounts on a class basis or even individually.

28. Notably, this case involved complex information technology issues that required Plaintiffs' counsel to be well versed and educated regarding online retailing, Distributed Denial

of Service attacks, cyber security, and commercial database management and operation, as well as other issues including but not limited to Sephora's fraud detection software, its website traffic monitors, and more. In fact, without such specialized knowledge, counsel likely would have been unable to properly assess the risks of litigation in the first place. Moreover, given the complexities of the data, discovery review and evaluation could not be tasked to junior lawyers or paralegals, thereby demanding partner and associate time to review more than 95% of the discovery.

29. Understanding of databases and how they deadlock, servers, bots, web traffic, and Sephora's fraud system were critical at all stages of this litigation in order to assess properly whether Sephora complied with discovery requests, whether more data needed to be produced and why. Ultimately, this specialized knowledge was necessary for counsel to arrive at a reasonable settlement range and advise Plaintiffs.

30. Under a lodestar method, and without using any multipliers, Plaintiffs' counsel is requesting fees less than what we have incurred, and excluding the amount of future time and costs – which is likely substantial. Moreover, under the relevant factors set forth in *Vizciano v. Microsoft Corp*., 290 F.3d 1043, 1048-50 (9th Cir. 2002), approval of attorneys' fees is justified as (i) counsel achieved an exception result; (ii) counsel took on considerable risk as Sephora is well-financed and aggressively asserted a number of defenses; and (iii) counsel has devoted considerable time and resources to this litigation and settlement thus far.

31. In sum, the lodestar cross-check confirms that the percentage requested is reasonable and fair. Indeed, the requested fees of $418,560 are lower than Class Counsel's current lodestar of $563,375.

32. As set forth in the Joint Brief and attached hereto, the parties provide further explanations about fees, costs and incentive awards as part of the proposed notice to the Class, both as part of Dahl's website and mailed notices if required.

### Attached Documents

33. In support of the Joint Brief, I attach hereto the following additional documents:

34. **Exhibit 4:** A copy of a recent retainer for a non-contingency case demonstrating my hourly rate at $850 an hour (with client name and identifying information redacted).

35. **Exhibit 5:** A redlined copy of the Proposed Order Preliminarily Approving the Proposed Settlement, with edits made to address the Court's concerns.

36. **Exhibit 6:** A clean copy of the Proposed Order Preliminarily Approving the Proposed Settlement.

37. **Exhibit 7:** A redlined copy of the proposed Court-Authorized Email Notice of Settlement, with edits made to address the Court's concerns.

38. **Exhibit 8:** A clean copy of the proposed Court-Authorized Email Notice of Settlement.

39. **Exhibit 9:** A copy of the proposed Long-Form Court-Authorized Notice of Settlement.

40. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: December 23, 2016
New York, New York                           By: */s/ Jeanne M. Christensen*
                                                  JEANNE M. CHRISTENSEN, ESQ.