**Pages 1 - 19**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

```
RUIQI YE and YOLIN HAN,              )
individually and on behalf of        )
all other similarly situation        )
individuals,                         )
                                     )
            Plaintiffs,              )
                                     )
   VS.                               )      NO. C 14-05237 EMC
                                     )
SEPHORA USA, INC.,                   )
                                     )
            Defendants.              )
_____)
```

San Francisco, California
Thursday, May 25, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
        Wigdor LLP
        85 Fifth Avenue
        New York, NY  10003
        (212) 257-6800
        (212) 257-6845 (fax)
    **BY:  ELIZABETH J. CHEN**
        **DAVID E. GOTTLIEB**

For Defendant Sephora USA, Inc.:
        Barack Ferrazzano Kirschbaum Nagelberg
        200 West Madison Street, Suite 3900
        Chicago, IL  60606
        (312) 984-3100
        (312) 984-3150 (fax)
    **BY:  SHERMIN KRUSE**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

1  **APPEARANCES**:

2  For Defendant Sephora USA, Inc.:
                              Orrick, Herrington & Sutcliffe LLP
3                             The Orrick Building
                              405 Howard Street
4                             San Francisco, CA   94105-2669
                              1 (415) 773-5700
5                     **BY:   ALEXANDRA HEIFETZ**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:14-cv-05237-EMC   Document 176   Filed 05/30/17   Page 2 of 19    2

1    **Thursday - May 25, 2017**                              **1:46 p.m.**

2                         **P R O C E E D I N G S**

3                                ---oOo---

4           **THE CLERK:** Calling Case C. 14-5237, Lee versus
5    Sephora.  Counsel, please come to the podium and state your
6    name for the record.
7           **MS. KRUSE:**  Good afternoon, Your Honor.
8    Shermin Kruse and Alexandra Heifetz, on behalf of defendant
9    Sephora.
10          **THE COURT:**  Thank you, Ms. Kruse.
11          **MR. GOTTLIEB:**  Good afternoon, Your Honor.
12   David Gottlieb and Liz Chen, from Wigdor, LLP, for the Class.
13          **THE COURT:**  Thank you, Mr. Gottlieb.  Welcome, by the
14   way.
15          **MS. KRUSE:**  Thank you.
16          **THE COURT:**  I appreciate the supplemental brief.
17   That clarifies for me the way the notices got out.  That makes
18   it clear that notice did get to a clear majority of the -- what
19   was the percentage?  It was 70-something percent or something?
20          **MR. GOTTLIEB:**  It was about 75 percent, Your Honor,
21   got noticed by e-mail or mail.
22          **THE COURT:**  So I'm satisfied that the notice effort
23   was -- it was the best possible practical method.
24       I have one question, though, regarding the "deficient"
25   claims that came back.  There were quite a few -- a number of

1  claims -- that were deemed deficient.
2          **MR. GOTTLIEB:** There were, Your Honor. I can address
3  those briefly, unless you had a specific question.
4          **THE COURT:** Well, what I wanted to find out is
5  that -- because simply the claimant provided an e-mail address
6  that didn't end with one of the three domain names, does
7  that -- was there any effort to follow up to see whether or not
8  that was just one of several e-mail addresses that that
9  claimant had?
10          **MR. GOTTLIEB:** Oh. Is Your Honor referring to the
11 deficient -- there were some deficient claim forms that were
12 sent in.
13          **THE COURT:** Yeah.
14          **MR. GOTTLIEB:** So the deficient claim forms -- there
15 were about -- there were slightly more than 1,500 of them, I
16 believe.
17          **THE COURT:** Mm-hm.
18          **MR. GOTTLIEB:** And the vast majority -- you know,
19 more than 95 percent of them were claim forms that came in from
20 people who did not qualify as class members. And so the reason
21 that happened is, in addition to the notice going out by e-mail
22 and mail, it was also posted on Sephora's website and Sephora's
23 Facebook page. And it, in fact, was also posted independently
24 on various social media websites. And so there were people who
25 were not class members who found out about this, and attempted

1  to file claim forms, even though they had no -- there were not
2  class members, at all.
3          **THE COURT:**  And they were determined not to be class
4  members because of the -- the -- on the basis of their e-mail
5  address?  They weren't from a QQ.com or 126.com or 163.com?
6          **MR. GOTTLIEB:**  That's correct, Your Honor.  I'm sorry
7  to drop -- but there were a handful of deficient forms that
8  came in from class members, and people who we could verify were
9  class members.  And we sent those people cure letters to make
10 sure they understood what they had to do, because they did not
11 sign, in fact, the affirmation.
12         **THE COURT:**  Okay.
13         **MR. GOTTLIEB:**  So it was -- that also occurred.
14         **THE COURT:**  All right.  So there, there was a cure
15 notice for those who had a form problem.
16         **MR. GOTTLIEB:**  Oh, I'm sorry.  My colleague is
17 telling me the cure notices were sent to all of the deficient
18 claim -- all of the deficient claim form submissions; not just
19 the ones --
20         **THE COURT:**  Oh.
21         **MR. GOTTLIEB:**  -- who we knew came from the
22 addresses; the e-mail addresses and mailing addresses we sent
23 them to.  So everybody who submitted a claim form received a
24 cure letter.
25         **THE COURT:**  And did the cure letter explain that you

1  had to have one of these suffixes?
2          **MS. CHEN:** Yes.
3          **MR. GOTTLIEB:** That's correct, Your Honor.
4          **THE COURT:** All right. So those who hadn't had one,
5  but maybe had two or three different, like, you know, a
6  gmail.com, they have to send in on that -- got notice that they
7  had to demonstrate that they had also a 163.com.
8          **MR. GOTTLIEB:** That's correct. And, Your Honor, the
9  claim form required that the class member sign an affirmation
10 that they did, in fact, have one of these e-mail addresses, and
11 they were deactivated, and unable to make purchases.
12         **THE COURT:** And so the 1,300 -- roughly 1,300
13 deficient forms did not -- had that opportunity, but could not
14 -- it was clear to them what they had to do.
15         **MR. GOTTLIEB:** Yes, it was.
16         **THE COURT:** Based on the cure notice?
17         **MR. GOTTLIEB:** Correct, Your Honor. And it was
18 approximately 1,500 or so.
19         **THE COURT:** Is that cure notice in the record? Did
20 you submit that, at all?
21         **MR. GOTTLIEB:** One moment, Your Honor.
22     (Discussion off the record.)
23         **MR. GOTTLIEB:** It was not, but we could certainly
24 supplement, you know; provide the Court a supplemental
25 submission.

1        **THE COURT:** Yeah.  I think for the record, why don't
2   you go ahead and do that?  Just submit that under a
3   supplemental declaration.
4        Now, given what you've represented to me, and assuming
5   that the cure notice says what it says, then I'm satisfied that
6   people were given "due process" -- quote, unquote; a fair
7   chance to correct any deficiency.
8        That being said, it appears that, in terms of the overall
9   settlement, I think a final approval is warranted for the same
10  reasons I stated in granting preliminary approval.
11       The settlement fund here, at least in its aggregate,
12  represents a reasonable portion of the total verdict value, in
13  light of the risks of litigation and the strengths and
14  weaknesses of the case, and all of the other factors that we
15  consider under Ninth Circuit precedent, and the fact that the
16  class response -- as I recall, there was a very little
17  opposition.
18       Remind me.  There was one objection, and three requests
19  for exclusion?
20       **MR. GOTTLIEB:**  That's correct.
21       **THE COURT:**  And that's out of 3,229 claim forms
22  received.  And notice that went to over 10,000 -- one way or
23  another, we now know that over 10,000 members of the class got
24  notice either by e-mail or by traditional mail.
25       **MR. GOTTLIEB:**  Got -- just to make sure the record's

1  clear, sightly more than 1,700 claim-form submissions.  That
2  was the total number of claim forms that were submitted.
3          **THE COURT:**  Well, I thought there were 3,000 claim
4  forms received, but a lot of those were not -- were -- then you
5  have to subtract the deficient ones --
6          **MR. GOTTLIEB:**  Right.
7          **THE COURT:**  -- and the invalid ones.  And there were
8  about 1,700 timely insufficient ones.  Is that right?
9          **MR. GOTTLIEB:**  There were 1,700 that were -- 1,707
10 that were authorized class members --
11         **THE COURT:**  Right.
12         **MR. GOTTLIEB:**  -- because they were able to make the
13 affirmation necessary.
14     And there were, in fact, Your Honor, 6 late submissions.
15 And those were -- those were approved as timely by Sephora.
16         **THE COURT:**  All right.  All right.  Well, in any
17 event, given the fact that there were over 10,000 people --
18 members of the class got notice, and there was only 1
19 objection, and only -- what? -- 3 requests for exclusion?
20         **MR. GOTTLIEB:**  Correct.
21         **THE COURT:**  That indicates when we look at all of the
22 relevant factors under *Hansen* and *Churchill*, that demonstrates
23 that this is a fair and adequate settlement.
24     Then that leaves the question of the fees here.  And I did
25 want to talk to you about that, because obviously, a red flag

1  goes up when the fee number -- the proposed fee award --
2  exceeds the amount of residual funds going to the class, and
3  exceeds the normal 25 percent benchmark.  And I understand that
4  there was a high lodestar here, but I do have to look at the
5  results obtained.  And so I'll take your comment on that, but I
6  have some issues with that.
7          **MR. GOTTLIEB:**  Sure.  Your Honor, I would start by
8  saying that I think there are more red flags than a typical 25
9  or 33 percent contingency fee award.  In those situations,
10 usually the lodestar is some fraction of that.  And counsel
11 uses a multiplier to justify it.  That fee is a cross-check.
12     And so in any class action settlement, there can be --
13 there can be a percentage-of-the-fund manner of calculating
14 fees, which is, I understand, more common; but there are other
15 ways of doing it, including the lodestar.  And in either event,
16 whether a lodestar is used or whether a percentage-of-the-fund
17 calculation is used, the hallmark of -- of the fees are
18 reasonableness.  The fee should be reasonable and appropriate.
19     And so there are a number of things I'd like to say about
20 why I believe our fees are exceedingly reasonable under these
21 circumstances.  First is the measure of recovery.  And I don't
22 mean to belabor the point, because I know Your Honor already
23 acknowledged that the recovery was adequate, but this was
24 really an extremely favorable result for the class members.
25     The likely economic loss to the class members if we were

1  able to, of course, prevail on class certification and prevail
2  on liability was likely less than even the $125 in cash; the
3  smaller of the two options that the class members had between
4  125 in cash, or 250 in a gift card.
5       Really what the class members lost out on is the potential
6  to get 20 percent off of Sephora products in a sale.  And given
7  the conversations we've had with class members, given the types
8  of products that are at issue here, the overwhelming likelihood
9  is that class members would have spent in the magnitude of in
10 the low hundreds of dollars during the sale.  And -- but even
11 if -- even if class members, on average, spent $500 or would
12 have intended to spend $500 on the sale, there's -- their
13 economic loss would be 20 percent of that, which was what the
14 sale was, which would be $100.
15      **THE COURT:**  Which would be an aggregate recovery of
16 around 1.5 million for 13,000 members.  Right?  Is that what
17 you're saying?
18      **MR. GOTTLIEB:**  Actually, I don't think that would be
19 the correct calculation, Your Honor, because the notice went
20 out, Your Honor, to 15,000 people.  That was the potential
21 class.  Those were people who -- and I think this is a very
22 important point.  Those were people who had e-mail addresses
23 with those particular domains.
24      But the class -- remember, Your Honor -- is only people
25 who had those domains e-mail addresses with those domains, and

1  who actually attempted to make purchases on the website during
2  that period.  And the overwhelming likelihood is that far less
3  than 100 percent of those people would have actually done that.
4  So we don't know what percentage did; but in all likelihood,
5  it's likely a small fraction of that, because even if it was,
6  you know, 50 -- 50 or 25 percent, that would be -- that would
7  reduce the overall potential damages substantially.
8       At this point, all we know is that 1,707 people have
9  affirmed that they had those e-mail addresses, they were locked
10 from the website, and would have intended to make purchases.
11      In all likelihood, there are some more people than that,
12 and, for whatever reason, did not submit a claim form; but it
13 would be inaccurate, Your Honor, to say that all 15,000 are
14 class members, based on the information we have.  Those would
15 be -- that would be the potential class.
16      So the -- whoever would have made purchases -- again,
17 Your Honor, the likelihood is that their economic loss is in
18 the range of $100.
19      Here, they have the option of 125 in cash, or 250 in a
20 gift card.
21      And, Your Honor, that gift card is -- in other situations
22 I would not say this, but in this situation for this case, that
23 gift card really is as good as cash.  And the reason is because
24 these are all the people who made claims are this very
25 important Beauty Insider status, which means they already spend

1  at least $350 per year on Sephora products.  So this is money
2  they will be using.  It's not a gift card for an item that they
3  may or may not want.
4      So the gift card is 250.  And it effectively cash for
5  these class members when their -- in all likelihood, their
6  economic loss is $100 on probably the high side.
7      Now, getting to the time and effort.  So I think the first
8  step in reasonableness is looking at the result we got.  And I
9  think, Your Honor, we got really an exceedingly good result for
10 the class members here.
11         **THE COURT:**  Well, tell me about the time and effort.
12 Remind me what motions did we go through in this, because
13 it's -- you spent about 400 hours on motions.
14         **MR. GOTTLIEB:**  Yeah, there was a lot of time on
15 motions.  There were multiple motions to compel.  And then, of
16 course, there was an extensive motion for class certification.
17 The motion for preliminary approval was substantial.  We did
18 substantial briefing, supplemental briefing, per Your Honor's
19 request, and then the briefing on this motion for final
20 approval, and our fee application, as well.
21     So there was -- there was substantial time put into this
22 case not only on motions; there was extensive discovery.
23         **THE COURT:**  How many depositions were taken?
24         **MR. GOTTLIEB:**  There were two depositions taken of
25 Sephora executives.  And both the named plaintiffs were

1  deposed, as well.

2       Your Honor, one thing to keep in mind is two plaintiff
3  depositions and two defendant depositions may not seem like a
4  lot, but the paper discovery -- the document discovery -- in
5  this case was very complex.  It involved computer code.  We had
6  to hire an outside vendor to consult with, to understand and
7  appreciate what all of those documents meant; and the
8  preparation for the depositions was extensive, in part because
9  of that.

10       Your Honor, the hours we put into this case using our
11 regular hourly rates totaled our fees at 780,000.  So our
12 fee --

13          **THE COURT:**  That's Southern District of New~York
14 rates.  Right?

15          **MR. GOTTLIEB:**  In candor, Your Honor, it's higher
16 than the Southern District rates.  The rates we used are the
17 rates -- are not made-up rates.  These are rates that we
18 submitted retainers that we charge hourly paying clients who we
19 bill.  And I'd submit to the Court that the best measure of
20 market rates is what people are actually paying.

21          **THE COURT:**  Right, but the law is we have to look at
22 the rates in the District from which -- so it's this District I
23 have to translate that into.

24          **MR. GOTTLIEB:**  That is true, Your Honor.  Even if we
25 were to reduce our rates by 25 percent, and even if we were

 1   then to reduce our hours by 25 percent, which I'm not at all
 2   suggesting should be done -- but even if we were to do that, we
 3   would -- our lodestar figure would still be 440,000.  And we're
 4   asking for less than that.  So I really think that the amount
 5   that we're requesting is appropriate, given the recovery, given
 6   the time, effort, and work we've put into the case.
 7        And a couple of other points, Your Honor, is that -- this
 8   case, we knew from the start, did not involve large potential
 9   damages for the potential class members; but we did feel that
10   this was an important case that involved an important public
11   interest.  And it's only through litigating cases like this
12   that some of these laws are enforced, at all.
13        And so we are -- we even if our fees are approved as we've
14   requested them, they are less than what we would have -- what
15   we would have made, using -- with hourly paying clients,
16   Your Honor.  And without getting appropriate fees for cases
17   like this, it would be very difficult if not impossible for our
18   firm and for other firms to take on cases like this, and
19   represent clients, and give clients a good selection of lawyers
20   to choose from, and have high-quality representation from which
21   to choose.
22        And the last point, before I address any other questions
23   Your Honor has, is that in this particular case, I think a
24   lodestar calculation or -- and what it really is, is a modified
25   or reduced lodestar calculation -- is even more appropriate

1  than using a percentage of the fund.  And that's because in a
2  typical class-action settlement, the class members and counsel
3  are, in a sense, choosing from the same pool, such that if
4  class counsel's fees are reduced, the class members will have
5  access to more funds.  Because of the individual caps on
6  recovery, a reduction in our fees will not result in any
7  substantial increase to the class members.
8            **THE COURT:**  Other than by way of *cy pres*?
9            **MR. GOTTLIEB:**  It would.  It would -- well, just to
10 be very clear, if our fees were reduced the maximum amount
11 that -- to gross every class member up to the caps, would only
12 mean an additional $6,000 going to the class.  And the rest
13 would go --
14           **THE COURT:**  Because they're already in, like, 123 or
15 something?
16           **MR. GOTTLIEB:**  That's right.  They're already very,
17 very close to the cap.
18           **THE COURT:**  And the rest would go to *cy pres*?
19           **MR. GOTTLIEB:**  And the rest would go to *cy pres*.
20      And, Your Honor, I would even voluntarily propose that
21 we'd be willing to provide that $6,000 off of our fee request,
22 so that all of the class members can be grossed up to the
23 maximum, and the rest would go to the *cy pres*.
24      And as for the *cy pres*, the *cy pres* we chose here,
25 which -- if you have any questions about this *cy pres*, my

1  colleague will speak to that.  The *cy pres* is very closely
2  aligned with the interests of the class here, Your Honor; but
3  it is very different for money to go to a *cy pres* than directly
4  to the class.  And the *cy pres* here is very likely to get a
5  substantial amount of funds, anyway.  I would imagine that
6  there would be some percentage of the gift cards or cash that
7  are not used by the class members.  We, of course, hope they
8  use them; but if they're not, the *cy pres* is likely to already
9  get thousands of dollars from this settlement.
10      And so removing money from counsel's fees, providing a
11 disincentive or deterrent to plaintiffs' counsel taking on
12 cases like this, I think, would really be a disservice to the
13 community.  And for that reason -- for those reasons,
14 Your Honor, I think our fees are reasonable.
15         **THE COURT:**  All right.  Ms. Chen, do you want to say
16 something about the appropriateness of the *cy pres* fund under
17 Ninth Circuit precedent?
18         **MS. CHEN:**  Sure.  So the National Asian Pacific
19 American Women's Forum is an organization that works
20 specifically to eradicate discrimination against Asian American
21 and Pacific Islander women, and so it's one of the few
22 organizations out there that works at that particular
23 intersection; and we think it's appropriate here, where a lot
24 of the class members are -- we know -- Chinese women.  And so,
25 you know, this kind of discrimination that they face -- NAPAWF

1  is at the forefront of addressing it, by looking at a variety
2  of forms of discrimination, including the pay gap, and adverse
3  stereotypes against Asian American women that lead to abortion
4  bans.  And so those same stereotypes that apply to Asian women
5  in those contexts -- this is exactly what this case is --
6          **THE COURT:**  Does the forum address consumer-rights
7  issues, at all?
8          **MS. CHEN:**  I think that there -- if there were an
9  issue that came up, they would address it.  Right now, a lot of
10 their issues are very reactive, so they're looking at laws that
11 have been passed, and what they need to fight against, rather
12 than working proactively; but I think that, should a consumer
13 issue arise, that that's something they would address.
14     One particular issue that they've addressed is women in
15 beauty salons who are -- who do not have healthy working
16 conditions.  And that was in direct response to a *New York*
17 *Times* study that came out and said, you know, there are really
18 bad working conditions for Asian women.  And so they reacted to
19 that.  So --
20         **THE COURT:**  Does the forum address issues
21 internationally, as well as just domestically?
22         **MS. CHEN:**  They mostly focus domestically, so -- but
23 it's a national organization; any issues that arise anywhere in
24 the country.
25         **THE COURT:**  I asked that question because that's one

1  of the factors, in terms of geographic overlap, somehow it's
2  often hard to replicate; but given that the class members here
3  are --
4      Are they largely based outside of the U.S. -- the class
5  members in this case?
6          **MS. CHEN:**  Our understanding is that they are mostly
7  in the U.S.
8          **THE COURT:**  In the U.S.
9          **MS. CHEN:**  They're anywhere in the country.  They
10 might have opened their e-mail accounts in China, but for the
11 most part, the billing addresses that we had on file were in
12 the U.S.
13         **THE COURT:**  I see.  All right.  Thank you.
14 Appreciate that.
15     Any comments from defense perspective at this point?
16         **MS. KRUSE:**  With respect to the fees, Your Honor?
17         **THE COURT:**  Or anything else we've talked about.
18         **MS. KRUSE:**  We're not moving to oppose the fees.
19 Thank you, Your Honor.
20         **THE COURT:**  Thank you.  I understand that.
21     All right.  Well, I've approved the settlement with
22 respect to the fees.  And there's also the issue of the
23 incentive award.  I'm going to take that under submission, and
24 look at the records a little more carefully.  And I'll issue a
25 final order shortly.

1        **MR. GOTTLIEB:**  Thank you, Your Honor.

2        **THE COURT:**  Thank you for your efforts.  And

3   congratulations on resolving this case and getting this case to

4   resolution.  I appreciate it.

5        **MR. GOTTLIEB:**  Thank you, Your Honor.

6        **MS. KRUSE:**  Thank you, Your Honor.

7      (At 2:09 p.m. the proceedings were adjourned.)

8      I certify that the foregoing is a correct transcript from

9   the record of proceedings in the above-entitled matter.

10

11  _Lydia Zinn_                                          May 30, 2017
    Signature of Court Reporter/Transcriber    Date
12  Lydia Zinn